**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

_____

TRACY SCROGGINS
individually and on behalf of all
others similarly situated,

        *Plaintiffs*,                                         Case No.:

v.

NATIONAL FOOTBALL LEAGUE, INC.,

        *Defendant*.

_____

## CLASS ACTION COMPLAINT

Plaintiff, Tracy Scroggins, ("hereinafter Plaintiff"), individually, and on behalf of all other similarly situated persons, by and through their undersigned counsel, brings this class action complaint against National Football League, Inc.

## NATURE OF THE ACTION

1.      This is an action seeking separate relief for medical monitoring, as well as compensation and financial recovery, financial losses, expenses and intangible losses suffered by current living Plaintiffs diagnosed with the degenerative brain disorder, Chronic Traumatic Encephalopathy (CTE) as a result of the defendant's carelessness, negligence, intentional misconduct, and concealment of information directly related to each Plaintiffs' injuries and losses. This action also seeks to recover fair compensation for the spouses of the player plaintiffs based upon their right to seek loss of consortium.

2.      The N.F.L.'s handling of its health crisis concerning repeated head trauma causing CTE is strikingly similar to that of the tobacco industry, which was notorious for using

questionable science to play down the dangers of cigarettes.  Records show that the two industries (N.F.L. and Big Tobacco) shared lobbyists, lawyers and consultants. Personal correspondence underscored their friendships, including dinner invitations and a request for lobbying advice.

3.      The league formed a committee in 1994 that would ultimately issue a succession of research papers playing down the danger of head injuries.  In 1997, to provide legal oversight for the committee, the league assigned Dorothy C. Mitchell, a young lawyer who had earlier defended the Tobacco Institute, the industry trade group. She had earned the institute's "highest praise" for her work.  Before joining the N.F.L., Ms. Mitchell, a young Harvard Law School graduate, had been one of five lawyers at Covington & Burling who had provided either lobbying help or legal representation to both the N.F.L. and the tobacco industry, sometimes in the same year.  A co-owner of the Giants, Preston R. Tisch, also partly owned a leading cigarette company, Lorillard, and was a board member of both the Tobacco Institute and the Council for Tobacco Research, two entities that played a central role in misusing science to hide the risks of cigarettes.[1]

4.      The N.F.L.'s concussion committee began publishing its findings in 2003 in the medical journal Neurosurgery. Although the database used in the studies contained numerical codes for teams and players, The Times decoded it by cross-referencing team schedules and public injury reports.  The N.F.L.'s concussion studies have faced questions since they were

---

[1] *See* http://www.nytimes.com/2016/03/25/sports/football/nfl-concussion-research-tobacco.html?smprod=nytcore-ipad&smid=nytcore-ipad-share.

published, but even the league's harshest critics have never suggested, and no evidence has ever arisen, that the underlying data set could be so faulty.[2]

5.      Most of the dozen committee members were associated with N.F.L. teams, as a physician, neurosurgeon or athletic trainer, which meant they made decisions about player care and then studied whether those decisions were proper. Still, the researchers stated unambiguously — in each of their first seven peer-reviewed papers — that their financial or business relationships had not compromised their work.[3]

6.      The committee said it analyzed all concussions diagnosed by team medical staffs from 1996 through 2001 — 887 in all. Concussions were recorded by position, type of play, time missed, even the brand of helmet.  The New York Times found that most teams failed to report all of their players' concussions. Over all, at least 10 percent of head injuries diagnosed by team doctors were missing from the study, including two sustained by Jets receiver Wayne Chrebet, who retired several years later after more concussions. Dr. Pellman, the Jets' physician, led the research and was the lead author on every paper.[4]

7.      In 1992, Mr. Tisch — the Giants and Lorillard part owner — asked the cigarette company's general counsel, Arthur J. Stevens, to contact the N.F.L. commissioner at the time, Mr. Tagliabue, about certain legal issues.  Mr. Stevens was not just any tobacco lawyer; he was a member of the industry's secretive Committee of Counsel, which helped direct tobacco research projects. In a letter obtained by The Times, Mr. Stevens referred Mr. Tagliabue to two court

---

[2] *Id., See also,* http://www.nytimes.com/2016/03/25/sports/football/at-least-100-concussions-left-out-of-nfl-studies.html?smprod=nytcore-ipad&smid=nytcore-ipad-share

[3] *Id., See also,* http://www.nytimes.com/2016/03/25/sports/nfl-issues-statement-about-article-and-the-times-responds.html?smprod=nytcore-ipad&smid=nytcore-ipad-share&_r=0

[4] *Id.*

cases alleging that the tobacco and asbestos industries had covered up the health risks of their products.[5]

8.      For more than 35 years, and until the August 4, 2011 Collective Bargaining Agreement with the N.F.L. Players Association was signed, the defendant and its designated representatives have continuously and vehemently denied that it knew, should have known or believed that there is any relationship between N.F.L. players suffering from CTE while playing, the N.F.L. policies regarding tackling methodology and long-term problems such as rage, impulsivity, depression, confusion, memory loss, and ultimately advanced dementia. Those denials have been stated in N.F.L. publications, N.F.L. sponsored so-called medical studies, testimony of N.F.L. representatives before Congress and in the media in response to other reports suggesting a causal connection.

9.      Recently, a top official with the N.F.L. made a stunning admission, agreeing with a neuropathologist before a Congressional panel that a link exists between football-related brain injuries and Chronic Traumatic Encephalopathy (CTE). The league had never before publicly acknowledged such a connection.  Jeff Miller, the N.F.L.'s senior vice president for health and safety, was speaking at a roundtable discussion on repeated head trauma and concussions convened by the House Committee on Energy & Commerce. When asked by Rep. Janice Schakowsky (D-Ill.) if a connection between football and CTE had been established, Miller replied, "The answer to that question is certainly yes."

10.     Miller's admission followed comments by Dr. Anne McKee, a professor of neurology and pathology at Boston University who focuses on neurodegenerative diseases. "I unequivocally think there's a link between playing football and CTE," she told the panel

_____

[5] *Id.*

Monday (via ESPN).  "We've seen it in 90 out of 94 N.F.L. players whose brains we've examined, we've found it in 45 out of 55 college players and 26 out of 65 high school players," McKee continued. "No, I don't think this represents how common this disease is in the living population, but the fact that over five years I've been able to accumulate this number of cases in football players, it cannot be rare. In fact, I think we are going to be surprised at how common it is."

      11.     During the 1970s, 1980s and 1990s, players in the N.F.L. were being coached, trained and motivated to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. These techniques were condoned by the N.F.L. and/or not significantly condemned by the N.F.L., despite the defendant's awareness that this practice was causing an increased risk in repeated head trauma leading to CTE among players. Further, even after the N.F.L. approved a rule change in1989 to provide referees with the authority to eject a player who is observed using his helmet in this fashion, the N.F.L. did not insist on the strict enforcement of this rule because of the defendant's interest in keeping its fan base excited over the visual excitement generated by such techniques.

      12.     In the early 1970s, the N.F.L. became aware of publications accounting for the rate and seriousness of repeated head trauma (that directly leads to CTE) in the sport of football. At the same time, the N.F.L. became aware of the publication of a helmet standard, known as the NOCSAE for football helmets, and which was intended to improve upon the safety of helmets and minimize the risk of head injury. The N.F.L. in the 1970s learned that the NCAA and National High School Football Federations (NHSFF) had adopted a policy requiring by the beginning of the 1978 season that all helmets used in their respective organizations must be

approved for sale and comply with the NOCSAE standard. The N.F.L. did not make or adopt a similar policy at that time.

13.     Rule makers in the NCAA and the NHSFF in the early 1970s recognized that the helmet face mask combination was contributing to the use of the helmeted-head as an offensive weapon, which in turn was increasing the rate of repeated head trauma leading to CTE. In 1976, these organizations initiated changes which prohibited initial contact of the head in blocking and tackling. While the N.F.L. was aware of these changes in the rules and this risk of harm, it failed to take similar action.

14.     In 1979, the N.F.L. promulgated a rule, with an associated (albeit inadequate) penalty, for players who are found to have used their helmets to butt, spear or ram an opponent with the crown or top of the helmet. This undertaking by the N.F.L., based upon the duty of care it owed the N.F.L. players, fell far short of the important safety and injury prevention action that should have been taken. This rule adopted by the N.F.L. came several years after a similar rule was adopted by the NCAA and the NHSFF; this rule related to a recognized risk of spinal cord injury in football. This rule ignored the more prevalent practices in the N.F.L. that was directly causing a substantial and high rate of repeated head trauma leading to CTE amongst N.F.L. players.

15.     During the 1970s, 1980s and 1990s, players in the N.F.L. were being coached, trained and motivated to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. These techniques were condoned by the N.F.L. and/or not significantly condemned by the N.F.L., despite the defendant's awareness that this practice was causing an increased risk in repeated head trauma leading to CTE among players. Further, even after the N.F.L. approved a rule change in1989 to provide

6

referees with the authority to eject a player who is observed using his helmet in this fashion, the N.F.L. did not insist on the strict enforcement of this rule because of the defendant's interest in keeping its fan base excited over the visual excitement generated by such techniques.

16.     Despite its awareness of the aforementioned dangerous practices and increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the N.F.L. turned a blind eye to the players being coached, trained and/or motivated to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads because of the defendant's interest in keeping its fan base excited and interested in the violence of this sport. And, in fact, when in 1996 the N.F.L. undertook to promulgate a rule making it a personal foul with potential associated fines to hit with the helmet, its purpose was not to protect the player using the helmet but rather to protect quarterbacks. Thus, evidencing a complete disregard for the risk of harm and safety of players who have been condoned for using this tackling technique.

17.     The high incidence of repeated head trauma, which ultimately lead to CTE among N.F.L. players has been well known to the defendant. The defendant has known or it has had reason to know, from its supervisory and management role, that N.F.L. players suffering repeated head trauma were more likely to experience evolving symptoms of post-traumatic brain injury including CTE until March 21, 2016.  The defendant has continued to deny any connection or correlation between players suffering repeated head trauma and long term chronic brain injury or illness. Further, the defendant has taken an active role in concealing or actively disputing any causative connection between repeated head trauma in football in the N.F.L. and brain injury/illness.

While the N.F.L. was well aware from its supervisory and management role that N.F.L. players suffering repeated head trauma were more likely to experience Chronic Traumatic Encephalopathy, the defendant failed to act reasonably by developing appropriate means to identify at risk players and guidelines or rules regarding return-to-play criteria. The defendant's breach of duty in this respect increased the risk of long term injury and illness as referenced above.

18. On September 30, 2009, as a part of its continuing active role in disputing and covering up the causative role of repeated head trauma suffered by N.F.L. players and long-term mental health disabilities and illnesses, the defendant disputed the results of a scientific study that it funded. On the aforementioned date, newspaper accounts were published detailing (an unreleased) a study commissioned by the N.F.L. to assess the health and well-being of retired players, which found that the players had reported being diagnosed with dementia and other memory-related diseases at a rate significantly higher than that of the general population. Despite the findings of this study, showing that 6.1 percent of retired N.F.L. players age 50 and above reported being diagnosed with dementia, Alzheimer's disease and other memory related illnesses, compared to a 1.2 percent for all comparably aged U.S. men, the defendant's agents disputed these findings and continued the mantra in the Press that there is no evidence connecting repeated head trauma and long-term brain illness or injury, including Chronic Traumatic Encephalopathy (CTE).

19. The defendant has, over the past four decades actively concealed and actively disputed any correlation between repeated head trauma and CTE.  During the decades of the 1990s and 2000s, the defendant through its authorized agents disputed and actively sought to suppress the findings of others that there is a connection between on-field head injury and CTE.

Despite its knowledge of the grave risks players in the N.F.L. have been exposed to because of the defendant's concerted inaction or concealment of safety information, the defendant carelessly failed to take reasonable steps to develop appropriate and necessary steps to alert players to their risk of long-term neurogenic illness.

20.     Dozens of former players -- including 34 who played in the N.F.L. -- have been diagnosed posthumously with CTE, a neurodegenerative disease linked to dementia, memory loss and depression. CTE is triggered by repeated head trauma.  Brain scans performed on former N.F.L. players revealed images of the protein that causes football-related brain damage -- the first time researchers have identified signs of the crippling disease in living players.

21.     UCLA researchers last year used a patented brain-imaging tool to examine Fred McNeill, a 59-year-old former Vikings linebacker; Wayne Clark, a 64-year-old former backup quarterback; and three other unidentified players: a 73-year-old former guard; a 50-year-old former defensive lineman; and a 45-year-old former center. Each had sustained repeated head trauma.  CTE is caused by a buildup of tau, an abnormal protein that strangles brain cells. The scan lit up for tau in all five former players, according to the study. The protein was concentrated in areas that control memory, emotions and other functions -- a pattern consistent with the distribution of tau in CTE brains that have been studied following autopsy, according to the researchers.

22.     The N.F.L. once attacked Dr. Julian Bailes, co-director of NorthShore Neurological Institute, and Dr. Bennet Omalu's, a pathologist who in 2005 identified the first case of CTE in a former N.F.L. player, research and denied the link between football and CTE. The league later reversed its position and acknowledged a scientific connection between football and long-term brain damage.

9



**Brain scans done as part of a UCLA study showed tau in the brains of five living former N.F.L. players. UCLA**

The following stages of CTE have been identified based on the tau seen in living N.F.L.

players:



**STAGE 1**
# NO SYMPTOMS

In stage 1, isolated spots of tau build up mostly around the frontal lobe, or the crown of the head.

CTE causes a protein known as tau (the brown spots in this stained slide above) to form around the brain's blood vessels, interrupting normal functioning and eventually killing nerve cells.



**STAGE 2**
# RAGE, IMPULSIVITY, DEPRESSION

In stage 2, symptoms begin to appear as defective tau protein affects more nerve cells in the brain's frontal (top) lobes.







Normal Brain                    Advanced CTE

Source: Boston University Center for the Study of Traumatic Encephalopathy

23.     For the last 13 years, the N.F.L. has stood by the research which was based on a full accounting of all concussions diagnosed by team physicians from 1996 through 2001. But confidential data obtained by The New York Times shows that more than 100 diagnosed concussions were omitted from the studies — including some severe injuries to stars like quarterbacks Steve Young and Troy Aikman. The committee then calculated the rates of concussions using the incomplete data, making them appear less frequent than they actually were.

24.     From 1996 to 2001, the N.F.L. gathered data in an effort to study the dangers of repeated head trauma. Whenever a concussion was diagnosed, the team physician was to record information like the player's position, his symptoms and how much time he spent recovering.

25.     As is common in such studies, players' names and teams were represented only by codes, and the information is believed to have never been seen by more than a few committee members. There were 887 concussions recorded in all, forming a log that was consistently

described as every head injury that teams had cared for during those six seasons.  The database served as the backbone for the committee's 13 research papers.

26.     The New York Times recently obtained the data, however, and was able to determine the identities of all of the teams and many of the players. Subsequent analysis confirmed that at least 100 concussions, including some serious ones to the game's top players, were not included in the league's studies.  To identify the teams, The Times examined the dates on which each team's concussions occurred and whether the game was listed as home or away. That information was compared with the teams' schedules during that time.  Many teams could fit only one pattern; other information, like whether the injury took place on natural or artificial grass, was used to determine and reconfirm the team identifications.

27.     This process led to the conclusion that no Dallas Cowboys players appear in the database — most significantly quarterback Troy Aikman, whose four concussions during that period led him to retire early. Other teams have no listings for years at a time.

28.     In some cases, contemporary news media articles helped with the identification of players who had sustained concussions that were announced by team officials but were apparently not considered significant enough to later list them on the N.F.L.'s official injury reports. Such players were matched with possible database listings.

29.     This process of identification and elimination identified more than 100 players whose concussions were publicly announced but still not included in the league's research. It is unclear how many more concussions were diagnosed by teams but, because the symptoms ceased quickly, were never mentioned to outside outlets.

30.     After The Times asked the league about the missing diagnosed cases — more than 10 percent of the total — officials acknowledged that "the clubs were not required to submit

their data and not every club did." That should have been made clearer, the league said in a statement, adding that the missing cases were not part of an attempt "to alter or suppress the rate of concussions."

31.     One member of the concussion committee, Dr. Joseph Waeckerle, said he was unaware of the omissions. But he added: "If somebody made a human error or somebody assumed the data was absolutely correct and didn't question it, well, we screwed up. If we found it wasn't accurate and still used it, that's not a screw-up; that's a lie."

32.     These discoveries raise questions about the validity of the committee's findings, published in 13 peer-reviewed articles, and held up by the N.F.L. as scientific evidence that brain injuries did not cause CTE to its players. It is also unclear why the omissions went unchallenged by league officials, by the epidemiologist whose job it was to ensure accurate data collection and by the editor of the medical journal that published the studies.

33.     The defendant's continuing relationship with the plaintiffs and all others whom they represent were accompanied by a scheme to conceal information and facts it knew regarding the risks of long-term disabilities associated with players suffering repeated head trauma, the inappropriate time to return to play and other errors set forth herein.

34.     The defendant failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This failure increased the risk of injury that has materialized (referenced above) or will materialize in the future.

35.     The defendant is liable to Plaintiffs and all other similarly situated Plaintiffs for medical monitoring as a result of the defendant's negligence, carelessness, concealment and other misconduct.

## JURISDICTION AND VENUE

36.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs; (2) a member of the class of Plaintiffs is a citizen of a State different from a defendant; and (3) the number of members of all proposed Plaintiff classes in the aggregate is greater than 100.

37.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District.

38.     Venue is proper in this district pursuant to 28 U.S. C. § 1301(a)(2) and 1391(b)(2) as a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the defendant conducts substantial business in this jurisdiction.

## PARTIES

39.     Plaintiff Tracy Scroggins is an individual residing in Fort Lauderdale, Florida. Mr. Scroggins played in the from 1992 to 2001 for the Detroit Lions as a linebacker and defensive end.  Mr. Scroggins is currently living and has had a preliminary diagnosis of Chronic Traumatic Encephalopathy as a result of repeated head trauma.

40.     Defendant, National Football League, Inc. is a business entity with its principal offices at 280 Park Avenue, New York, NY 10017.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

"All current or former living N.F.L. players who sustained repeated head trauma while in the N.F.L. league, and who have, since leaving the N.F.L., been preliminary diagnosed with Chronic Traumatic Encephalopathy."

42.     The following persons are expressly excluded from the Class: Any person who has pending against the Defendant, on the date of the Court's certification order, any individual action or grievance proceeding wherein the recovery sought is based in whole or in part on the type of claims asserted herein, and who has accepted the Article 65 Neuro-cognitive Disability Benefit in the August 4,2011 CBA, or has previously obtained a judgment or entered into a settlement of claims concerning the same type of losses asserted herein.

43.     Rule 23(a) and Rule 23(b), Fed. R. Civ. P. requirements are met because:

a.      Plaintiffs estimate that the proposed class consists of not less than several thousand members throughout the United States, and joinder of all members in this action is impracticable.

b.      There are questions of law and fact common to the class.

c.      The common questions predominate over any questions affecting only individual members.

d.      The named Plaintiffs are adequate representatives of the class. The claims of the Plaintiffs as class representative are typical of those of the class members in that they were subjected to the same unlawful treatment, and the named Plaintiffs suffered the same type harm as suffered by other members of the class. The class representatives will vigorously pursue the claims on behalf of the class, and will fairly and adequately protect the interests of the class. Plaintiffs' counsel is experienced and professionally able to properly represent the class.

e.      The claims of the representative party are typical of the claims of each member of the class, and are based on or arise out of similar facts constituting the wrongful conduct of the Defendant.

f.      A class action is far superior to any other available method for the fair and efficient adjudication of this controversy.

43.     Prerequisites to a Class Action - Fed. R. Civ. P. 23(a). The prerequisites to maintaining this action as a Class action are satisfied in this case as alleged below:

a.  **Numerosity** - On information and belief, there are several thousand current and former N.F.L. players who have suffered repeated head trauma while playing and who were harmed by the same misconduct described above, and who have developed or will in the foreseeable future develop Chronic Traumatic Encephalopathy. All of these former players have suffered because of the same misconduct by the defendant. Although the exact number of such persons is unknown to the Plaintiff at this time, Defendant's records should contain information on the identities and location of all such parties. Because Defendant has exclusive control of such information, the Plaintiffs reserve the right to amend their allegations following completion of discovery. Given the scope of the Defendant's business, it is clear that the members of the Class are so numerous that joinder is impracticable and the disposition of their claims in a Class action will provide substantial benefits to the parties and the Court.

b.  **Commonality** - Since the Plaintiffs and other members of the Class all played in the N.F.L. under the same inadequate rules and practices, and the same woefully inadequate return to play policies, and they all suffered repeated head trauma and returned to play under flawed policy standards set by the defendant which in turn led to their chronic

18

problems as set forth above, there are questions of law and fact common to the Class. Such common questions of law and fact predominate over any individual questions affecting Class members.

c. **Typicality** - Named Plaintiffs have the same interests in this matter as all the other members ofthe Class, and their claims are typical of all members of the Class. The named plaintiffs' claims are typical of the claims of all class members because: the claims originate from the same practices on the part of the defendant and its acts in furtherance thereof and the named plaintiffs.

d. **Adequacy of Representation** - Plaintiffs' claims are aligned with the interests of the absent members of the Class such that the Class claims will be prosecuted with diligence and care by Plaintiffs as representatives of the Class. Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in the prosecution and successful resolution of Class litigation. Plaintiff will fairly and adequately represent the interests of the Class and do not have interests adverse to the Class. Plaintiffs' interests are antagonistic to the interests of the Defendant and Plaintiff will vigorously pursue the claims of the Class.

e. **Class Actions Maintainable** - Fed. R. Civ. P. 23(b)(3). Class action status is also appropriate because the common question of law and fact identified above predominate over questions affecting only individual members. A Class action is superior to other available methods for the fair and efficient adjudication of this litigation. It is desirable to concentrate the litigation of the claims in this District. Plaintiffs and their counsel do not anticipate encountering any unique difficulties in the management of this action as a Class action.

## COUNT I - CONCEALMENT

44.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 43 above as if fully set forth herein.

45.     The Defendant concealed facts and information which caused all plaintiffs to become exposed to the harm referenced above.  As a proximate cause of the concealment of the defendant, each Plaintiff was caused to suffer harm described above and each has suffered damages that are continuing in nature and as yet have not been fully ascertained.

46.     Wherefore, the Plaintiffs individually and in their representative capacities hereby demand damages from the defendant in an amount to be determined at trial, plus interest and costs.

## COUNT II - CIVIL CONSPIRACY

47.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 43 above as if fully set forth herein.

48.     The Defendant actively and deliberately conspired with its team members and/or independent contractors who were directed to continuously discount and reject the causal connection between repeated head trauma suffered while playing in the N.F.L., and the chronic long term effects of these injuries including CTE.

49.     This conduct between the defendant and others was a proximate cause of the chronic injuries and damages suffered by the Plaintiffs and the class members.

50.     Wherefore, the Plaintiffs hereby demand damages from the Defendant in an amount to be determined at trial, plus interest and costs.

## COUNT III -NEGLIGENCE

51.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 43 above as if fully set forth herein.

52.     The Defendant assumed a duty toward the Plaintiffs and the members of the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

53.     The Defendant acted carelessly and negligently in its position as the regulator body for all the team members and the plaintiffs and the class members. The defendant knew or should have known that its actions or its inaction in light of the rate and extent of repeated head trauma reported in the N.F.L. would cause harm to players in both short and long term.

54.     The Defendant was generally careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs and the class members, both generally and in the following particular respects:

a.  Failing to warn of the risk of unreasonable harm resulting from repeated head trauma;

b.  Failing to disclose the special risks of long term complications from repeated head trauma;

c.  Failing to disclose the role that repeated head trauma has in causing CTE;

d.  Failing to promulgate rules and regulations to adequately address the dangers of repeated head trauma to minimize long-term chronic cognitive problems such as CTE;

e.  Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play;

f.  Concealing pertinent facts;

g.  Failing to adopt rules and reasonably enforce those rules to minimize the risk of players

suffering from CTE; and,

h.  Other acts of negligence or carelessness that may materialize during the pendency of this

action.

**<ins>COUNT IV - DAMAGES-For the named PLAYERS and Their spouses</ins>**

55.     Plaintiff re-alleges and incorporates by reference the allegations contained in

paragraphs 1 through 43 above as if fully set forth herein.

56.     The Plaintiffs individually have each sustained past medical expenses and will in

all likelihood incur future medically related costs associated with the harm suffered and injuries

and disability referenced above.

57.     The Plaintiffs individually have suffered a loss of earnings and may in the future

suffer a loss of earnings capacity associated with the harm suffered and the injuries and disability

referenced above.

58.     The Plaintiffs individually have in the past experienced, and they may in the

future suffer from an assortment of problems associated with the harm and injuries described

including, but not limited to, headaches, dizziness, loss of memory, depression, impulsivity to

anger, cognitive dysfunction, employment impairment, limitations in physical activities,

embarrassment, loss of the pleasures of life, etc.

59.     As a result of the foregoing, the Plaintiffs have suffered damages and will in the

future suffer damages caused by the misconduct of the Defendant. The Plaintiffs are entitled to

damages in an amount to be determined at trial.

60.     Pursuant to the common law, the Plaintiff-Spouses seek to recover for the past

and future loss of consortium and other harm to their relationship and marriage with their

husband-players.

## COUNT V - VIOLATION OF RICO 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(a) AND (c)

61.     Plaintiffs and class members incorporate and re-allege paragraphs 1-43 above as if fully set out herein.

62.     This claim for relief arises under 18 U.S.C. § 1964(c). 159. In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate: 18 U.S.C. § 1962 (a) by using and investing income received from a pattern of racketeering, directly or indirectly, which is engaged in the conduct described herein, and whose activities affect, interstate commerce; and 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct as described herein through a pattern of racketeering.

63.     As a direct and proximate result, Plaintiffs and class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering and their investment and reinvestment of income therefrom to operate, expand and perpetuate the conduct described herein.

64.     Specifically, Plaintiffs and class members have been injured in their business or property by the N.F.L.'s concealment of known facts showing the high incidence of repeated head trauma which ultimately lead to CTE among N.F.L. players.   The defendant has known or it has had reason to know, from its supervisory and management role, that N.F.L. players suffering repeated head trauma were more likely to experience evolving symptoms of post-traumatic brain injury including CTE until March 21, 2016.  The defendant has continued to deny any connection or correlation between players suffering repeated head trauma and long term chronic brain injury or illness. Further, the defendant has taken an active role in concealing

or actively disputing any causative connection between repeated head trauma in football in the

N.F.L. and brain injury/illness.

## COUNT VI - MEDICAL MONITORING

65.     Plaintiff re-alleges and incorporates by reference the allegations contained in

paragraphs 1 through 43 above as if fully set forth herein.

66.     The class has been exposed to a greater risk of CTE due to repeated head trauma,

which then have an increased risk of suffering long-term injury and illnesses as described above.

67.     The class who have not yet begun to evidence the long-term physical and mental

effects of the defendant's misconduct require specialized testing that is not generally given to the

public at large for the early detection of the long-term effects of repeated head trauma.

68.     The available monitoring procedures/regime is specific for individuals exposed to

repeated head trauma which are different from that normally recommended in the absence of

exposure to this risk of harm.

69.     The available monitoring procedures/regime is reasonably necessary according to

contemporary scientific principles within the medical community that specializes in close head

injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer like

syndromes.

70.     Pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure,

the Plaintiffs seek certification of a medical monitoring national class in this matter, consisting

of:

*"All retired N.F.L. players and current N.F.L. players who have during their career, to*

*their knowledge, suffered repeated head truama", but not as of the date of the filing of*

*this lawsuit developed or experienced any of the long-term problems identified above; and,*

*"All current and future N.F.L. Players who from the date this lawsuit is filed and into the future suffer repeated head trauma."*

71.    By monitoring and testing former and current N.F.L. players who are suspected to have suffered or who will in the future suffer from repeated head trauma while playing or practicing, it can be determined whether each such player is sufficiently healthy to return to play and/or it will significantly reduce the risk of each such player suffering long term injuries, disease and losses as described above.

72.    Because until now the defendant has failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered repeated head trauma to minimize the risk of long-term injury or illness, medical monitoring is the most appropriate method by which it can be determined whether a particular individual is now at risk or long-term injury or illness from repeated head trauma.

73.    Accordingly, the defendant should be required to establish a medical monitoring program that includes, *inter alia:*

a.  Establishing trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future N.F.L. players, as frequently and appropriately as necessary;

b.  Notifying all Plaintiff class members in writing, in addition to notices to each Team member of the N.F.L. and health care providers, that these former and current players require frequent medical monitoring;

   c.  Providing information to treating team physicians, other physicians and Team members to aid them in detecting repeated head trauma to assist them in determining when the player is subjected to an increased risk of harm.

74.    Medical Monitoring is appropriate because: (1) the exposure to repeated head trauma and their related sequelae are greater than normal background levels; (2) the harm was the result of the promulgation of inadequate techniques and/or the failure to promulgate proper and/or adequate techniques; (3) which were promoted or the direct result of the defendant's failure to adopt and follow safety policies it knew or should have known about; (4) as a proximate result of the exposure to the aforesaid harm, the class has a significantly increased risk of contracting and/or developing serious and potentially life threatening latent neurogenic disease processes caused by repeated head trauma; (5) a monitoring procedure exists to detect evolving neurogenic disease process that makes the early detection essential to delay the progression of neurological deficits including but not limited to dementia, permanent memory loss and other life altering diseases and affects; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## **PRAYER FOR RELIEF**

75.    WHEREFORE, the Plaintiffs individually and on behalf of the proposed Class, pray for judgment as follows:

A.  Certification of the proposed Class pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B.  Designation of the football player Plaintiffs as representative of the proposed Class and designation of Plaintiffs' counsel as Class counsel;

C.  An award of compensatory damages for all of the named plaintiffs and their spouses, the amount of which is to be determined at trial;

D.  An award to the individual Plaintiffs and the Class of such other and further relief as the Court deems just and proper.

## **JURY DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by jury.

Dated:  March 25, 2016

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Tim Howard*
Tim Howard, J.D., Ph.D.
Florida Bar No.: 655325
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
Telephone: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com

</div>